**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1916-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TIREAK M. CRUZ,

     Defendant-Appellant.

_____

Submitted May 14, 2026 – Decided August 10, 2026

Before Judges Bishop-Thompson and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 24-09-0551.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Nadine Kronis, Assistant Deputy Public Defender, of counsel and on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (John J. Santoliquido, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Following an unsuccessful motion to suppress evidence seized without a warrant, defendant Tireak M. Cruz entered a negotiated guilty plea to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), and was sentenced in accordance with the plea agreement to a five-year prison term. He now appeals from the November 13, 2024 Law Division order denying his suppression motion. We affirm.

I.

The following facts are drawn from the testimony, city surveillance camera video, and body-worn camera (BWC) footage considered by the motion judge. Trenton Police Department Detective Sergeant Gilbert Quinones and Detectives Alan Reasoner and Freddy Jimenez, members of the department's crime suppression unit, were on duty on July 5, 2024. Detective Sergeant Quinones received information from the New Jersey State Police crime suppression unit indicating a Black male in the area of Asbury Street was carrying a green satchel containing a handgun.[1] Detective Sergeant Quinones communicated this information to Detectives Reasoner and Jimenez, who drove

---

[1] Although Detective Sergeant Quinones testified the initial information he received included a description of the suspect's clothing, the motion judge attributed this oversight to the detective's "misremembering or conflating information that he later learned."

to the area in a marked patrol vehicle and positioned themselves near the intersection of Union and Steamboat Streets. None of the officers knew the source of the information provided by the State Police.

Detective Sergeant Quinones returned to police headquarters to monitor the livestream footage from a city surveillance camera positioned near the intersection of Asbury and Steamboat Streets. The livestream showed a Black male in an orange shirt with a dark-colored crossbody satchel arrive on Asbury Street on a motorbike. He parked the motorbike adjacent to a residence, walked up the front steps of the residence, and knocked on the door.[2]

As the first individual stood on the steps, a Black male in jeans and a white T-shirt, later identified as defendant, crossed Asbury Street, had a brief exchange with the first individual, and walked back across the street out of the camera's view. The first individual then left on the motorbike.

About two minutes later, defendant walked back to the residence, bent over next to the front steps and then straightened up. As he started walking down Asbury Street, he placed a dark-colored satchel across his body. From the camera angle, Detective Sergeant Quinones was unable to discern whether

---

[2] The motion judge observed the individual "appear[ed] to do something to the left side of the steps but it's not clear."

A-1916-24

defendant was carrying the satchel when he approached the house the second time or if he retrieved it from the side of the steps. Defendant then got into a taxi waiting on Steamboat Street.

Detective Sergeant Quinones relayed the descriptive information to Detectives Reasoner and Jimenez. They saw the taxi approach where they were positioned, and Detective Reasoner observed it fail to signal before making a right turn from Steamboat Street onto Union Street.

Detective Reasoner, who was driving, made a U-turn and followed the taxi on Union Street. As they neared the taxi, Detective Jimenez observed it turn right onto Ferry Street without signaling. The taxi entered the line of traffic but then "made an abrupt reverse maneuver as if it [were] going to change directions but then didn't change directions" and proceeded to make the right turn.

Due to heavy traffic on Ferry Street, Detective Reasoner waited until the taxi reached a less congested area before initiating a traffic stop by engaging the overhead lights. He testified:

> Once the taxicab came to a complete stop and we were stopped behind it, the passenger rear door immediately opened and [defendant] exited the vehicle and was standing in the doorway of the vehicle and turned back and looked at my vehicle where me and my partner were seated. At that point we had already begun exiting the vehicle. My partner, Detective Jimenez,

4

A-1916-24

yelled to [defendant] to stop at which point he shut the
door and began running away.

The officers observed defendant was wearing a white T-shirt, blue jeans, and had a green satchel.

Detective Jimenez pursued defendant on foot, while Detective Reasoner followed in the patrol vehicle. While running on the sidewalk, defendant threw the satchel over a fence. He then lay down on the sidewalk and surrendered to the police. After defendant was placed under arrest, officers recovered the satchel, which contained a revolver, ammunition, heroin, and twenty-two dollars. A Mercer County grand jury returned an indictment charging defendant with: second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count one); fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2) (count two); and second-degree certain persons not to possess a handgun, N.J.S.A. 2C:39-7(b)(1) (count three).

Defendant's subsequent motion to suppress argued the officers lacked reasonable articulable suspicion to stop the taxi and seize him, and the subsequent search and seizure of his bag was unlawful. After a two-day testimonial hearing, the judge denied defendant's motion in an oral decision, finding the officers had reasonable suspicion to stop the taxi for motor vehicle violations, and defendant was lawfully seized as a passenger. The judge further

5

determined defendant abandoned the satchel during his flight, thereby forfeiting any expectation of privacy in its contents.

Defendant now raises the following points for our consideration:

POINT I

THE MOTOR VEHICLE STOP OF THE TAXI WAS UNLAWFUL BECAUSE THE POLICE LACKED REASONABLE ARTICULABLE SUSPICION THAT THE TAXI FAILED TO SIGNAL A TURN IN VIOLATION OF N.J.S.A. 39:4-126.

POINT II

THE POLICE LACKED REASONABLE ARTICULABLE SUSPICION TO SEIZE [DEFENDANT].

A.     Unlike Passengers of Private Cars, Taxi Passengers Are Not Seized at the Inception of a Traffic Stop.

B.     The Police Officers Lacked Reasonable Articulable Suspicion to Seize [Defendant] When They Ordered Him to Stop.

II.

We defer to a trial court's factual findings in a suppression hearing "when 'those findings are supported by sufficient credible evidence in the record.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)).  The trial judge has the "'opportunity to hear and see the witnesses and

to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Reece, 222 N.J. 154, 166 (2015) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). We will not disturb the trial court's factual findings unless they are "'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). However, no deference is owed to the trial court's application of the law to the facts, which is reviewed de novo. State v. Fenimore, 261 N.J. 364, 373 (2025).

Both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution "protect individuals' rights 'to be secure in their persons, houses, papers, and effects.'" State v. Andrews, 243 N.J. 447, 464 (2020). "Warrantless searches are presumptively unreasonable under both [the Federal and State] constitutions," State v. Cohen, 254 N.J. 308, 319 (2023), and "the clear preference is that police officers secure a judicial warrant before executing a search," State v. Gonzales, 227 N.J. 77, 90 (2016). "[T]o overcome that presumption . . . , the State must show by a preponderance of evidence that the search falls within one of the well-recognized exceptions to the warrant requirement." State v. Smart, 253 N.J. 156, 165 (2023). However, "[w]hen determining the propriety of a warrantless seizure, '[t]he question is not

whether the police could have done something different, but whether their actions, when viewed as a whole, were objectively reasonable.'" State v. O'Donnell, 203 N.J. 160, 162 (2010) (second alteration in original) (quoting State v. Bogan, 200 N.J. 61, 81 (2009)).

"'A motor-vehicle stop by the police' constitutes a seizure." State v. Carter, 247 N.J. 488, 524 (2021) (quoting State v. Scriven, 226 N.J. 20, 33 (2016)). To justify a stop, "ordinarily, a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense." Scriven, 226 N.J. at 33-34. "[T]he State has the burden of proving the validity of the search." State v. Maryland, 167 N.J. 471, 489 (2001).

Reasonable suspicion is "a less demanding standard than probable cause." Goldsmith, 251 N.J. at 399. However, "'[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" Ibid. (alteration in original) (quoting State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part)). Rather, reasonable suspicion must arise from the totality of the circumstances "in view of [the] officer's experience and knowledge, taken

together with rational inferences drawn from [the] facts." State v. Davis, 104 N.J. 490, 504 (1986).

Defendant first maintains the conflicting testimony of Detectives Reasoner and Jimenez regarding the circumstances behind the traffic stop indicates the lack of reasonable and articulable suspicion to justify the stop. The detectives each testified to observing different motor vehicle violations at different times and locations: Reasoner claimed to have seen the taxi fail to signal a right turn from Steamboat Street onto Union Street; while Jimenez testified he observed the taxi fail to signal a right turn from Union Street onto Ferry Street. Defendant argues this inconsistency undermines the credibility of the officers' testimony and therefore the stop was pretextual.

Defendant further contends the detectives lacked reasonable suspicion to stop the taxi under N.J.S.A. 39:4-126, which only mandates a vehicle to signal "in the event any other traffic may be affected by such movement." According to defendant, the record shows the only other vehicle in the area during the first alleged violation was the detectives' police car, which was stationary and facing the opposite direction. Because traffic would not have been affected by the taxi's failure to engage the turn signal, there was no reasonable suspicion to justify the stop.

With respect to the second alleged violation, defendant argues the officers could not observe whether the taxi failed to signal within the required distance before turning onto Ferry Street. Defendant contends the BWC footage shows the taxi was already in the process of turning and merging into traffic by the time the officers were behind it, making it impossible for them to determine whether the signal had been used. He claims the detectives' testimony on this point was speculative and unsupported by the BWC footage. Thus, defendant maintains the fruits of the unconstitutional search and seizure must be suppressed.

N.J.S.A. 39:4-126 provides:

> No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in section 39:4-123, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a roadway, or start or back a vehicle unless and until such movement can be made with safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other traffic may be affected by such movement.
>
> A signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.

In State v. Williamson, our Supreme Court addressed the justification needed to support a traffic stop pursuant to N.J.S.A. 39:4-126. 138 N.J. 302

10

(1994).  Notably, "[t]he statute . . . does not require that a signal be given whenever a lane change is made" and "[t]he language—may affect traffic—implies that traffic that may be affected is fairly close and visible, and that the signal need not be dictated solely by concerns of safety and accident avoidance." Id. at 303-04 (emphasis omitted).  As such, to justify a stop under the statute, "the State need not show that the signal did in fact affect traffic, but only that it had 'the potential of doing so.'" State v. Heisler, 422 N.J. Super. 399, 413 (App. Div. 2011) (quoting State v. Moss, 277 N.J. Super. 545, 547 (App. Div. 1994)).

The motion judge found the detectives' testimony credible, noting "[t]here were certain lapses of memory or mistakes none of which . . . were significant enough to lead the court not to rely upon their testimony in general."  The judge also viewed the surveillance and BWC camera footage.  As to the justification for the traffic stop, he credited Detective Reasoner's testimony because "although it's not depicted on his [BWC], . . . [there] would necessarily have been a violation of [N.J.S.A. 39:4-126] . . . [and] the State need not show that the signal, in fact, affected traffic but only that it had the potential of doing so." The judge noted the reasonable, articulable suspicion required for the traffic stop was a lower bar than proving a motor vehicle offense occurred beyond a reasonable doubt.

Although the judge was unconvinced the taxi's initial failure to signal justified the stop, he observed:

> [O]nce the cab proceeded up Union Street and got to the intersection with Ferry Street, the cabbie failed to signal again. At this point the case is even stronger that there's a reasonable and articulable suspicion for a motor vehicle stop for a violation of [N.J.S.A.] 39:4-126 because the cabbie did not signal his turn. At that point there's plenty of traffic to be affected, not just the detectives who were following but all the stop-and-go traffic on Ferry Street.
>
> The cab has half made the turn. It's depicted on the [BWC]. The light is not illuminated. It's not blinking. One conceivably could say well, maybe the cabbie made his turn and then the steering wheel then adjusts and the directional signal stopped, but that might be a defense to the charge but the court credits the detectives that the cab did not turn on its signal at any time before it turned onto Ferry Street.
>
> . . . .
>
> At that point, the officers had a reasonable and articulable suspicion to make a motor vehicle stop for a violation of [N.J.S.A.] 39:4-126. Notwithstanding the detectives' testimony that . . . the reason they were stopping the vehicle was for a motor vehicle violation, it seems clear that they had two reasons to stop[.] . . . [T]hey wanted to investigate the information that there was someone carrying a gun but the legal basis for stopping the vehicle at that point was the motor vehicle violation.

12

Having considered defendant's arguments in light of our standard of review, we discern no reason to disturb the judge's findings of fact and credibility. The detectives' versions were largely consistent with each other and the BWC footage. The taxi's second turn, which was captured on BWC, shows the blinker was not engaged at the time the vehicle made the turn onto Ferry Street. The BWC also shows Ferry Street was congested with vehicles; therefore, the signal had the potential to affect traffic. Thus, the record supports the judge's conclusion the stop was justified.

Defendant next argues the motion judge erred in finding he was seized at the moment the taxi came to a stop and in concluding the officers had reasonable suspicion to justify his seizure based on an anonymous tip and his subsequent flight. Citing Brendlin v. California, 551 U.S. 249, 262 n.6 (2007), he contends taxi passengers, unlike passengers in private vehicles, are not automatically seized when the taxi is stopped for a traffic violation, and individual states are to consider when suppression of a taxi passenger occurs. Defendant claims the court erred in ruling he was seized when the taxi was pulled over because, as a taxi passenger, he had no connection to the driver or the alleged traffic violation and thus should not have been deemed seized until the officers specifically ordered him to stop.

13

Defendant further contends the officers lacked reasonable articulable suspicion to seize him when Detective Jimenez ordered him to stop, because the only information they had was an extremely general and unreliable anonymous tip and the fact he ran from the police after the taxi was stopped. Defendant argues New Jersey law is clear that an uncorroborated anonymous tip cannot provide reasonable suspicion for an investigatory stop, especially when the tip merely describes innocent details such as race, location, and possession of a common item like a bag. See State v. Richards, 351 N.J. Super. 289, 300-01 (App. Div. 2002). He argues the tip was not predictive and was not corroborated by any evidence of criminal activity, and his act of running from the police, either alone or combined with the anonymous tip, did not amount to reasonable suspicion.

An investigative stop, often referred to as a Terry[3] stop, does not require probable cause to believe a person has committed or is about to commit an offense. Rather, "[a] police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer ha[s] a reasonable and particularized suspicion to believe that an individual has just engaged in, or was

---

[3] Terry v. Ohio, 392 U.S. 1, 21 (1968).

A-1916-24

about to engage in, criminal activity." Stovall, 170 N.J. at 356 (citing Terry, 392 U.S. at 21).

"When police stop a motor vehicle, the stop constitutes a seizure of persons, no matter how brief or limited." State v. Nyema, 249 N.J. 509, 527 (2022). A warrantless stop of a motor vehicle does not violate the prohibitions against unreasonable searches and seizures "'if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity.'" Ibid. (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)).

In State v. Crawley, 187 N.J. 440, 448 (2006), our Supreme Court addressed whether the defendant violated the obstruction statute, N.J.S.A. 2C:29-1, by running from the police after receiving an order to stop. The statute provides:

> A person commits an offense if [the person] purposely obstructs, impairs[,] or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.
>
> [N.J.S.A. 2C:29-1(a).]

The Court analyzed the statutory requirement of "lawfully performing an official function," and determined the language means "a police officer acting in objective good faith, under color of law in the execution of his duties." Crawley, 187 N.J. at 460-61.  It held "when a police officer is acting in good faith and under color of his authority, a person must obey the officer's order to stop and may not take flight without violating N.J.S.A. 2C:29-1." Crawley, 187 N.J. at 451-52.  This is so even if the initial stop is later deemed unconstitutional because "[a] person has no constitutional right to use an improper stop as justification to commit the new and distinct offense of resisting arrest, eluding, escape, or obstruction, thus precipitating a dangerous chase that could have deadly consequences."  Id. at 459.

In addition, the Court recognized the strong public policy and legislative intent that "a person involved in a police encounter should [not] have an incentive to flee or resist, thus endangering himself, the police, and the innocent public."  Id. at 451.  The Court therefore affirmed the defendant's obstruction conviction, finding the officers acted in objective good faith in attempting to stop and talk to the defendant after receiving a dispatch describing an armed suspect fitting the defendant's description, and the defendant obstructed their efforts by fleeing.  Id. at 461-62.

16

"When property is abandoned, however, the defendant has 'no right to challenge the search or seizure of that property.'" State v. Gartrell, 256 N.J. 241, 250 (2024) (quoting State v. Johnson, 193 N.J. 528, 548 (2008)). "[P]roperty is abandoned only if '(1) a person has either actual or constructive control or dominion over property; (2) he knowingly and voluntarily relinquishes any possessory or ownership interest in the property; and (3) there are no other apparent or known owners of the property.'" Id. at 251 (quoting State v. Carvajal, 202 N.J. 214, 225 (2010)). "The State bears the burden of proving that property was abandoned by a preponderance of the evidence." Ibid.

In rejecting defendant's contentions, the motion judge found defendant was lawfully seized as a result of the traffic stop of the taxi, and the detectives possessed reasonable and articulable suspicion to justify their actions under the totality of the circumstances. The judge found a passenger in a vehicle stopped by police is seized for Fourth Amendment purposes and an officer can direct a passenger to remain for a reasonable period of time. Specifically, he reasoned:

> [A]fter the detectives stopped the cab, . . . they had two independent grounds for conducting . . . an investigatory stop of . . . defendant. First, they had reasonable and articulable suspicion of a motor vehicle violation. And . . . defendant was seized as a passenger and he was not free to go and the officers were justified in telling . . . defendant he was not free to go. There

was a motor vehicle stop for a violation of [N.J.S.A. 39:4-126] that was being conducted.

There was a second reason to conduct an investigatory stop. Once . . . defendant started to run, that fact, along with the other facts that already exi[s]ted, . . . at that point ripen to reasonable and articulable suspicion of possession of a firearm. Now, I don't need to reach the decision as to whether the facts up until . . . defendant's decision to flee was enough, but we have . . . defendant's flight plus the corroboration in part of the anonymous tip.

So, the anonymous tip by itself may or may not have been enough. It was partly corroborated in that the State Police said there's a Black man with a green satchel with a gun in it and . . . Detective Sergeant Quinones saw a Black man in a white T-shirt with a green bag but he had no idea whether there was a gun in there or not and he had no basis to credit what he had been told because as far as he was concerned, it was an anonymous tip. It was not a predictive tip; [it] didn't say he's going to be getting into a cab in a moment. I don't know if that would have moved the needle, but [I] didn't have that either.

But once . . . defendant fled immediately upon a motor vehicle stop, that, plus the fact that he was carrying a satchel as identified according to the anonymous tipster and the fact that satchels—and I should add this—I credit the detectives' testimony that satchels are increasingly used for carrying and concealing firearms. So, it wasn't just any form of luggage . . . .

. . . .

18

So, you have that fact, you have the anonymous tip, you have . . . defendant getting into the cab and then fleeing. This court views that as a reasonable basis for [Detective] Jimenez to conduct that stop and order . . . defendant to stop.

Then there's a third reason to conduct a seizure of . . . defendant which is his failure to obey the demand to stop which constitutes a violation of at least reasonable and articulable suspicion of a violation of N.J.S.A. 2C:29-1, the obstruction statute. He disobeyed the order.

Even if there had never been a call from the State Police, someone hops out of a cab and starts running away after the police officer tells him to stop, tells the passenger to stop, that would be an obstruction under [N.J.S.A. 2C:29-1]. So, now . . . defendant is running down the street. There are three reasons for the officers to stop him, to seize him, and as he's running away, he tosses the bag over the fence.

. . . .

. . . [D]efendant abandoned the bag so the police were authorized to recover it and to open it and search it without any further justification for opening the container.

. . . The stop did not violate . . . defendant's constitutional rights and the weapon was properly seized after an authorized search of the abandoned satchel.

The detectives' stop of the taxi, coupled with defendant's immediate flight and information he may have a weapon in a satchel, supports the judge's

19

conclusion defendant was not free to leave and was therefore lawfully seized. As the judge found, this flight provided the officers with probable cause to arrest him for obstruction under N.J.S.A. 2C:29-1(a).

Additionally, the judge properly found defendant abandoned the green satchel when he threw it over a fence while fleeing from the police, forfeiting any reasonable expectation of privacy in that property. Because the satchel was intentionally discarded during the flight from the officers' lawful command to stop, defendant relinquished any privacy interest he may have had in its contents and cannot claim any constitutional protection of it. The motion judge's findings are supported by sufficient credible evidence in the record, and we discern no basis on which to disturb the order on appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

20                                                                 A-1916-24